[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage. The parties were married on July 31, 1993; therefore, at the time this action was returned to court they had been married less than three years. There are no children issue of the marriage.
The plaintiff, Mrs. Nilson, is 41 years old; the defendant, Mr. Nilson, 53. Both are in good health and have reliable incomes from employment or, in Mr. Nilson's case, a pension from IBM, where he was employed for 30 years. That pension is in the annual amount of $49,500, while Mrs. Nilson's income from her employment at Bridgeport Hospital is $43,000. Mrs. Nilson has a Master's degree in Business Administration, and Mr. Nilson is a 1996 law school graduate, just admitted to the Connecticut bar. Both advanced degrees have been obtained during this marriage, and the court believes the parties were supportive of each other's educational goals.
Excluding his IBM pension plan, to which Mrs. Nilson makes no claim, Mr. Nilson's assets total approximately $221,000. Mrs. Nilson's assets, including a house she owns in Orange, Connecticut, amount to $244,000. Not counting their attorneys' fees, Mrs. Nilson and Mr. Nilson have liabilities totalling $7,000 and $17,000, respectively.
The court has considered all of the criteria of Sections46b-62, 46b-81 and 46b-82 of the General Statutes, together with the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account", Scherr v.Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence, other than as stated subsequently in this memorandum. "The court is not obligated to make express findings on each of these statutory criteria."Weiman v. Weiman, 188 Conn. 232, 234 (1982). Suffice it to say that the court must consider all the statutory criteria in CT Page 87 determining how to divide the parties' property in a dissolution proceeding, Leo v. Leo, 197 Conn. 1, 5 (1985), and need not give equal weight to each factor. Kane v. Parry, 24 Conn. App. 307,313-14 (1991).
This is one of those rare cases in which the cause of the breakdown of the parties' marriage looms larger than the other statutory factors in the court's analysis. Their marriage was a short one by any standard. Both parties are in good health; they are educated, intelligent and self supporting, with substantial assets. While Mr. Nilson may have a higher earning capacity than Mrs. Nilson, given his recent admission to the bar, no evidence was introduced on that subject, and the court makes no finding. See Schmidt v. Schmidt, 180 Conn. 184, 190-91 (1980).
Each party accuses the other of deceit in connection with a critical issue in their marriage; viz., their intentions regarding children. Mrs. Nilson has never married and has no children. Mr. Nilson was married once previously and has two adult daughters. At the time they were married Mrs. Nilson was 38 years old, and Mr. Nilson was 50. He had recently begun his law school curriculum at night while still working full-time at IBM. The parties agreed that, prior to their marriage, they discussed having children, but they give very different accounts of those discussions. Mr. Nilson is clear that he told his wife that a child was out of the question until he had finished law school, given the demands on his time and the reduction in his income that he contemplated when he retired from IBM after he finished law school. Thereafter, he testified, he would be willing to have children with Mrs. Nilson. Mrs. Nilson, on the other hand, recalls that Mr. Nilson committed himself to having children, even if adoption might be required, and denies that he stated that no children were possible prior to his graduation from law school.
Based on the court's observation of the parties and its understanding of their testimony, the court accepts Mr. Nilson's account as closer to what occurred between the parties and finds therein the cause of the parties' dissolution. His inflexible insistence on his previously established plan for retirement, a second career and the postponement of children until that career was launched by his graduation from law school, heedless of the effect on Mrs. Nilson's prospects for children, doomed the parties' marriage, poisoned its atmosphere and led to many of the other "communication problems" which plagued the parties. CT Page 88
Mr. Nilson testified that neither prior to nor during the marriage did he give any thought to the decreased chances of pregnancy for Mrs. Nilson arising from his insistence on delaying children for at least four years until he finished law school. He sought no medical advice on the prospects for childbirth when she would be in her early 40's and he in his mid-50's. Two specific examples suffice to demonstrate Mr. Nilson's attitude toward the issue of children and its effect on Mrs. Nilson and their marriage. When he learned that Mrs. Nilson was pregnant for the second time during the marriage, the first pregnancy having ended in a miscarriage, he reacted very angrily, telling Mrs. Nilson that he was making two phone calls when he went to work on Monday morning; the first to his doctor to arrange a vasectomy, and the second to an attorney regarding a divorce. Mrs. Nilson miscarried that pregnancy two weeks later.[1] In early 1996, while the parties were still living together, and, Mr. Nilson testified, he still desired to save the marriage, he went ahead with a vasectomy because he had decided it was the only way he could gain control over the issue of children. He did this despite his testimony that Mrs. Nilson told him he was choosing between her and a vasectomy. Mrs. Nilson vacated the parties' bedroom on the day of the vasectomy.
These extreme reactions seem to have been based on Mr. Nilson's belief that Mrs. Nilson, on two occasions, had seduced him into unprotected sexual relations, as part of a plan to become pregnant, obtain a divorce and secure financial support from him for their child. The court finds no rational basis in the evidence for such a conclusion.
This attitude and these actions on the part of Mr. Nilson have had devastating effects on Mrs. Nilson. While she may not have been realistic in assessing the depth of Mr. Nilson's commitment to his plan, she entered their marriage with legitimate expectations of children, at least eventually, and a long-term relationship with a loving husband and father. Those hopes have now been dashed. In addition, at age 41 her chances for pregnancy have been further diminished, if not destroyed, and may require in the future extensive medical treatments with no guarantee of success. Her experience to date indicates that any pregnancy on her part would be a high-risk pregnancy. The Connecticut Supreme Court has held that, in making awards of either alimony or property distribution "it is entirely proper for the court to assess the impact of the errant spouse's conduct CT Page 89 on the other spouse". Robinson v. Robinson, 187 Conn. 70, 72
(1982). Indeed, a party's role in causing the breakdown of a marriage may, by itself, justify an award of lump sum alimony.Martone v. Martone, 28 Conn. App. 208, 217 (1992). As the court said in Robinson, "[w]hile alimony, in whatever form, or an assignment of property is not to be considered either as a reward for virtue or as a punishment for wrongdoing, a spouse whose conduct has contributed substantially to the breakdown of the marriage should not expect to receive financial kudos for his or her misconduct". Id.
The testimony at trial indicated that Mrs. Nilson has borne expenses that arose directly out of the marriage and has incurred and will incur in the future expenses in connection with her resumption of residence in her Orange home. The court's orders will contain an award of lump sum alimony intended to provide reimbursement for those medical and other expenses already incurred and the resources necessary to incur reasonable future expenses, as well as a portion attributable to Mr. Nilson's substantial contribution to the breakdown of this marriage.
In addition, the same factors considered by the court in determining an award of alimony are to be considered in determining whether or not to award counsel fees to a party. See Section 46b-62, C.G.S. Under the same statute the court must consider the "respective financial abilities of the parties". In this case Mr. Nilson's assets are considerably more liquid than Mrs. Nilson's, and to make her pay all of her counsel fees out of her assets would undermine the court's other award of lump sum alimony. Therefore, the court's orders will also contain an award of counsel fees for approximately 50% of Mrs. Nilson's counsel fees.
Mrs. Nilson's complaint is in two counts, the second alleging adultery on the part of Mr. Nilson. While evidence was introduced at trial to indicate that Mr. Nilson maintained an unusually close relationship with a female colleague at IBM during the marriage, for the court to find that adultery occurred based on that entirely circumstantial evidence would require inferences that the court is unwilling to make. Therefore, the second count of Mrs. Nilson's complaint is dismissed.
Based on the testimony of the parties and the allegations in the first count of Mrs. Nilson's complaint, the court at the time of trial found that it had jurisdiction, that the allegations of CT Page 90 that count of the complaint were proven and true, and that the marriage had broken down irretrievably. Accordingly, and at the request of the parties, the court dissolved the marriage of the parties and expressly retained jurisdiction to enter financial orders at a later date. Based on those findings, as well as the court's consideration of the testimony and exhibits introduced at trial, its observation of the witnesses and assessment of their credibility, the court enters the following orders:
 1. The defendant shall pay to the plaintiff as lump sum alimony the sum of $30,000 within thirty days of the date of this memorandum.
 2. At the same time as the payment of alimony is made by the defendant to the plaintiff he shall pay her the sum of $12,000 toward her counsel fees in this matter.
 3. After payment of these sums, the escrow account, in which are the proceeds of the sale of the defendant's former residence, may be closed, and the proceeds distributed to the defendant.
 4. The income tax refund check now held by plaintiff in the amount of $4,342 shall be divided equally between the parties, and the defendant may deduct his 50% share of that refund from the lump sum alimony ordered in paragraph 1, above.
 5. The defendant shall retain all of the assets shown on his financial affidavit of October 16, 1996 without any claim by the plaintiff. The plaintiff shall retain all of the assets shown on her financial affidavit of October 16, 1996 without any claim by the defendant except that she shall pay the defendant $800, the remaining balance shown in People's Bank account #031-5055009 on Schedule C. Each party shall be responsible for payment of all the liabilities shown on their respective financial affidavits, and each shall indemnify and save the other harmless from any liability thereon.
 6. Any remaining disputes the parties have as to the distribution of their personal property are referred to the Family Services Office in accordance with Valenti v. Valenti, 180 Conn. 528, 533 (1980), for CT Page 91 investigation, conciliation and a report to the court if any issues cannot be resolved. The court retains jurisdiction to resolve any remaining disputes.
SHORTALL, J.